1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF OREGON

3                  PORTLAND DIVISION

4

UNITED STATES OF AMERICA,     )

5                      )

                Plaintiff,  )  Case No. 3:14-cr-00267-BR

6                      )

            v.          )

7                      )  December 21, 2015

MORGAN ELIZABETH GODVIN,     )

8                      )

              Defendant.  )  Portland, Oregon

9  _____)

10

11

12

13                     SENTENCING

14              TRANSCRIPT OF PROCEEDINGS

15        BEFORE THE HONORABLE ANNA J. BROWN

16        UNITED STATES DISTRICT COURT JUDGE

17

18

19

20

21

22

23

24

25

```
1                          APPEARANCES

2   FOR THE PLAINTIFF:
                         LEAH K. BOLSTAD
3                        United States Attorney's Office
                         1000 SW Third Street
4                        Suite 600
                         Portland, OR 97204
5
    FOR THE DEFENDANT:
6                        RUSSELL S. BARNETT III
                         Russell S. Barnett III PC
7                        1500 SW 1st Avenue
                         Suite 780
8                        Portland, OR  97201

9

10

11

12

13

14

15

16

17

18

19

20

21  COURT REPORTER:    Jill L. Jessup, CSR, RMR, RDR, CRR
                       United States District Courthouse
22                     1000 SW Third Avenue, Room 301
                       Portland, OR 97204
23                     (503)326-8191

24

25                          *   *   *
```

TRANSCRIPT OF PROCEEDINGS

1
2          THE COURT:  Good afternoon, everyone.  Please be
3   seated.  Ms. Bolstad?
4          MS. BOLSTAD:  Thank you, Your Honor.  Good afternoon.
5   Leah Bolstad for the United States.  This is the matter of the
6   United States v. Morgan Elizabeth Godvin.  Case number
7   14-cr-267.  This is the sixth defendant listed in that case.
8   Ms. Godvin is present.  She is in custody, represented by
9   counsel, Mr. Barnett.  We're here for Ms. Godvin's sentencing.
10      I've submitted a sentencing memorandum as well as a letter
11   that is dated -- I think I actually sent you two separate
12   letters.  One is dated December 16, 2015, and the other is
13   dated December 17th.  The letter of the 17th is -- have
14   enclosed a video that's approximately 20 minutes with excerpts
15   of what Ms. Godvin put together.
16          THE COURT:  Yes.  I have had a chance to review that
17   video.  Would you state, please, the government's sentencing
18   position?
19          MS. BOLSTAD:  Your Honor, in this case, you will --
20   you well remember trial in this matter.  Early November of
21   2015.  Ms. Godvin didn't go to trial.  She was a cooperating
22   co-defendant, and she testified in the trial of two other much
23   higher-ranking heroin traffickers in this conspiracy case.  I
24   thought her testimony was brave, straightforward.  She did not
25   hold back in a way that made herself look good.  She just did

1   what was asked of her.  She told the truth.  Sometimes that

2   truth made her look really bad.  She owned up to doing some --

3   making some very bad mistakes.  And from the very beginning of

4   this case, until today's sentencing, Ms. Godvin has been

5   consistent in taking ownership of her actions.  Much more so

6   than many other defendants I've seen in her shoes.

7        I think that Ms. Godvin has come a long way since the

8   beginning of this case, and the government's recommendation at

9   sentencing is one that is grounded in treating the defendants

10  in this case and comparing them to all other defendants in

11  Len Bias cases the same.

12       Based on that guideline analysis and employing the things

13  that apply, as the PSR states, we started at a base offense

14  level of 38, which is the highest level you can do in a drug

15  case, a two-level enhancement for a dangerous weapon, a

16  three-level reduction for minor role, a three-level reduction

17  for acceptance, and a two-level reduction on the government's

18  motion under 3553(a) for her very early acceptance of

19  responsibility, and a four-level reduction based on my motion

20  under Chapter 5K of the guidelines.  And all of those things

21  bring us to an offense level 28, Criminal History Category II,

22  where the range is 87 to 108 months.

23       This is the exact same guideline analysis that the

24  Court -- that the government submitted in Mr. Rosa's case.  He

25  was a co-defendant.

1    And you will recall that in Mr. Rosa's case the 87

2    months -- the government moved for a reduction of the 87 down

3    to 71, based, in part, on the fact that Mr. Rosa was not -- we

4    did not believe he would get credit for that time on his

5    federal case because he was not writted to the state of Oregon

6    until much later in the game.  After his Ohio case resolved.

7    So without that Ohio case, Mr. Rosa -- the low end of 87

8    seemed very appropriate for him.

9    This defendant reaches the same low end, 87, but I'm

10   asking the government for a downward variance from there.

11           THE COURT:  Asking the Court?

12           MS. BOLSTAD:  I'm sorry.  I'm asking the Court for a

13   variance to 60 months' imprisonment.  And I think that my word

14   will fall short as to why.  I think that Ms. Godvin is very

15   eloquent in speaking for herself.  You've seen her videos, the

16   excerpts of what she had to say about how much she's learned

17   from this, her plans for the future, and her own remorse in

18   this matter.

19   But I think that most important to Ms. Godvin is her plans

20   for the future.  This is somebody who's thought a lot about

21   what to do next.  She's really contemplative, and I think that

22   when you hear her plans for the future, that's something that

23   will inform your decision about what to sentence her to because

24   I'm not sure that more prison is necessarily the answer for

25   Ms. Godvin.  I think that with a lot of structure on supervised

1    release she could be very successful.

2         It will be up to Ms. Godvin.  But I think that with random

3    UAs, a structured life where she's reporting to people

4    constantly, is going to be very good for her.  And unlike a lot

5    of other defendants who we see, I think that Ms. Godvin has the

6    intellect and the capacity to make very good choices.  As

7    you'll see here in court, she's surrounded by a very supportive

8    community that she has told us that she's reconnected with

9    since her time in custody.  And it's sad and I know she's

10   ashamed that it took being in jail to reconnect with these

11   people who support and love her, but that's where we are.  And

12   I think with their continued support she will make better

13   choices in the future.

14        I know that the victim's mother, Ms. Gren -- is Ms. Gren

15   here?  Not yet.  Ms. Gren does intend -- I know she's on her

16   way to be here for sentencing, and she did wish to say

17   something, and I know that Ms. Godvin wished to speak to

18   Ms. Gren when she addresses the Court in this case.

19        But 60 months is what I'm authorized to ask for.  It's a

20   downward variance.  And I think the Court will -- you'll be

21   well informed after you hear Ms. Godvin.

22             THE COURT:  All right.  Thank you, Ms. Bolstad.

23        Mr. Barnett, good afternoon.

24             MR. BARNETT:  Good afternoon, Your Honor.

25   Russell Barnett on behalf of Ms. Godvin.  Your Honor, I'm

1  loathed to ever use superlatives, but in this case, actually, I

2  think it's appropriate.  I have never represented a client in

3  my 20 years of doing this that has put so much effort and

4  thought into what she's going to do after incarceration.

5  Honestly, never.

6      Candidly, she's put as much effort into her future as I

7  have.  As Ms. Bolstad will tell you I've put a lot of effort

8  into this case.  Ms. Godvin has, I believe, a great chance of

9  success.  I have made an offer to her that I think I've only

10 made three or four times in the past 20 years that I would be

11 happy to be a resource for her in any way whatsoever when she

12 gets out.

13     There's really not enough time in the day for me to go

14 through all of the things that Ms. Godvin has accomplished

15 while she's been in custody that will set her apart, but I

16 would like to run down a few.

17     As Ms. Bolstad stated, her acceptance of responsibility

18 and the candor with which she accepted responsibility --

19 literally, on the day of her initial appearance was her first

20 debrief.  There was -- even at that initial meeting there was

21 no minimalization, no sugarcoating, no dancing around it.  It

22 was refreshingly frank.

23     As you're aware, she worked with the United States

24 Attorney's Office to produce a video.  Hopefully that can be

25 used for education not only of high school students, younger

1    folks, to try to explain some of the concerns and worries for

2    the use of heroin and the risks attendant thereof, but also

3    that Ms. Bolstad is feeling it may be something she may be able

4    to use for education of other United States attorneys as well

5    as law enforcement agents.

6        During the time she's been in the Columbia County Jail,

7    she enrolled in college.  I've never had a client pre-prison

8    arrange for and enroll in college, and I would love to be able

9    to stand here and tell you she got an A in her coursework, but

10   I can't.  The reason being is when she was transferred -- step

11   back.

12       Mind you, the Columbia County Jail folks were happy to

13   proctor exams for her and everything.  When she was transferred

14   to Multnomah County for testimony during trial, she brought all

15   of her belongings with her, including her -- $200?

16            THE DEFENDANT:  $219.

17            MR. BARNETT:  -- $219 textbook.  Multnomah County

18   Sheriff's Office threw it away.  She wasn't able to get a

19   replacement in time to finish up by the conclusion of the term,

20   but she put the effort in there.

21       She also -- excuse me.  She's going to stay in my memory

22   for a long time for the story I'm about to relay.  We had a

23   phone conference while she was at MCI, at Inverness, and she

24   told me that she kept her pizza.  And I didn't quite know what

25   that meant, and then she explained it to me.

1    In commissary she could buy pizza while she was in

2  custody.   She had pizza and heated it up and was approached by

3  another inmate who offered her drugs in exchange for a slice of

4  pizza.   And Ms. Godvin said --

5           THE DEFENDANT:   "No thanks.   I'm good."

6           MR. BARNETT:   And kept her pizza.

7    Truly, it's one of the most moving things I've ever heard.

8  Given her history and difficulty of saying no in challenging

9  circumstances, and she did that, it just -- it floored me, to

10  use the vernacular.

11    While she was in custody at MCIJ, the Court will recall

12  from an earlier court hearing, we had asked for assistance from

13  the Court to get her transferred out of IJ because of the

14  rampant availability of drugs for in-custody inmates.   We

15  appreciate the -- the help, well, from Ms. Bolstad and the

16  Court that got her into Columbia County.

17    As she was transferred out, I contacted the intelligence

18  officer for Multnomah County Sheriff's to let them know that

19  Ms. Godvin would be happy to provide information about how

20  drugs were coming in.   He referred me to a detective.   A

21  detective contacted me.   I said that she had been transferred

22  to Columbia County.   He said that any information she has is

23  stale and hung up the phone.

24    It's ironic my client was more concerned about solving a

25  problem of drugs in the jail than the jailer.

1    Just as an aside, since she's been in Columbia County --

2    another first -- she tells me that one of the deputies, one of

3    the corrections deputies is actually here in support.  I've

4    never had that in a case before.  While she's been in custody,

5    her student loans are current.  She has developed a plan of

6    action for reduction or the elimination of drugs in custody.  I

7    think some of that was contained in the documents I provided to

8    the Court.  It was a well-thought-through plan.  It seems

9    remarkably obvious, and I'm surprised that it's not current

10   practice.

11   Ms. Bolstad and I have both discussed perhaps meeting with

12   the sheriff after this case and presenting Morgan's plan to him

13   and note the serious problem that it does have with regard to

14   drugs in the jail.

15   There's another program that I will be writing up as a

16   formal proposal.  And at first I was thinking on a -- step

17   back.  Morgan came up with a great idea.  What if inmates,

18   before they were released, were trained in the use of Narcan?

19   Narcan is the narcotic antagonist that if given immediately it

20   reverses the effects of an opiate.  There is Narcan training.

21   It's not that difficult in the number of lives it can save.

22   She had the insight to point out that that almost self-selects

23   the population that will have the most contact with people at

24   risk for overdose.

25   I've told her that I will be writing, with her help, even

1    after she's moved out of here, going to write that as a formal

2    proposal.  I was thinking about submitting it to some local

3    sheriff's offices, and we'll do that, but it's also one that,

4    as we were visiting yesterday, that checked with a couple of my

5    acquaintances in the Oregon House of Representatives, and that

6    might make for an interesting bill in the next full session.

7         It's just such a brilliantly elegant idea and solution to

8    a problem that's just, again, one of a kind.

9         She's been in contact with both her -- Senator Merkley, as

10   well as Representative Bonamici.  She's been in contact with

11   them for purposes of planning for her future.  She is checking

12   in with Senator Merkley for the availability of educational

13   funding after her release, even though she will have a federal

14   conviction.  She's also been in contact with

15   Representative Bonamici.  I forwarded a copy of that letter

16   today to the Court.  Ms. Bolstad has reviewed that as well.

17        She has done a phenomenal job of maintaining and

18   developing a good social support network, as you can see.  She,

19   in addition, has picked up me as a supporter, and I've told her

20   if she uses when she gets out she will never hear the end of it

21   from me.  I will be thoroughly disappointed.  She's given me

22   her word, and I'll take it at that.

23        I'm imploring the Court to go along with the government's

24   recommendation of 60 months.  The PSR writer also suggests 60

25   months.

1        I'm about to have to do the hardest thing to do as a
2   lawyer, as a defense lawyer, and I'm about to stop talking.
3   And I know there are going to be hundreds of things I'm going
4   to wish I would have said that I could have brought to your
5   attention about Ms. Godvin, but thank you.
6        We'll speak a little more with regard to her release plan.
7   But one of the conditions she's going to ask the Court to
8   impose as her probation is that she be mandated to take
9   Vivitrol.
10       Vivitrol is a very effective drug that, thanks to Morgan,
11  I've learned a lot about.  It basically prevents the person
12  from feeling the effects or the enjoyment, if you will, of
13  heroin or other opiates.  She's indicated to me that she
14  believes that will be a very helpful agent to help her maintain
15  her sobriety and staying clean when she gets out.
16       Again, that's a first for me, but we would ask the Court
17  to consider that as making that a part of her conditions of
18  release.
19       That's it.
20           THE COURT:  Before I speak with Ms. Godvin,
21  Mr. Barnett and Ms. Bolstad, this case has had many references
22  to the open secret of drug use in the county jail facilities,
23  and I think it's important that there be a communication to the
24  sheriff about the issue with reference to specific
25  documentation.

1     I would be happy to receive the letter from the two of you

2   to forward it to the sheriff personally with my concern.  I

3   don't want to speak out of turn, and I'm certainly not as

4   familiar as the two of you are with respect to the specifics

5   Ms. Godvin has offered.

6     I think, relating to the sheriff, the fact that one of his

7   investigators did not see fit to follow up may be because that

8   detective has a very heavy caseload or whatever.  It is worth

9   mentioning.  But the point is there needs to be a referral back

10  to the person ultimately responsible for our jails about the

11  specific information you developed in this case.  And that's

12  true as well as to the treatment program where Ms. Godvin

13  testified that she used while in inpatient treatment and how

14  common it was for people to leave the inpatient facility via

15  windows and doors that weren't within range of the motion

16  detector lighting.  That needs to be captured and conveyed in a

17  way that I think you can do better than I.

18    I have already raised the issue with our chief of

19  probation so that the programming issues are being addressed

20  in-house, but I think it's important that a record be made here

21  of the very specific evidence that -- that's come to the public

22  record through Ms. Godvin's testimony and Mr. Barnett's

23  advocacy.

24    So I encourage you to do that, and then I would be happy

25  to send that letter with my own concerns along with it.

```
 1              MR. BARNETT:  Thank you very much.

 2              THE COURT:  So, Ms. Godvin, a couple of formalities

 3   first.  I need to be certain you've actually seen the

 4   presentence report.

 5              THE DEFENDANT:  Yes, Your Honor.

 6              THE COURT:  And actually have reviewed it?

 7              THE DEFENDANT:  I have.

 8              THE COURT:  And discussed it with Mr. Barnett?

 9              THE DEFENDANT:  Yes, I have.

10              THE COURT:  Before I continue with you, let's also

11   make a point in this letter about the loss of this book.

12              THE DEFENDANT:  Okay.  Yes.  Absolutely.

13              THE COURT:  Mr. Barnett, the $219 book.  I'm not

14   suggesting a point be made, but I think it's important that

15   these issues not just be noted and then ignored.  Who knows if

16   there aren't many other people this happens to or not, but I

17   think it should -- it should reach the sheriff's attention.

18              MR. BARNETT:  Thank you, Your Honor.

19              THE COURT:  All right.  So, Ms. Godvin, I have a lot

20   of material.

21              THE DEFENDANT:  Yes, Your Honor.

22              THE COURT:  I have the DVD.  I have the lawyer's

23   letter.  I have your letter.  I have Representative Bonamici's

24   letter.  I have Ms. Bolstad's eloquent advocacy on your behalf.

25        What would you like to say?
```

1          THE DEFENDANT:  I think in all these criminal

2     proceedings we -- we lose the human cost of addiction a little

3     bit, and I would like to tell you about Justin DeLong.  I met

4     him in 2007, and we became really good friends in 2008.  He was

5     super brilliant.  We were friends, like, instantly.  Because he

6     was so smart, we could have these really deep philosophical

7     conversations.  And I'll never forget a joke that he told me in

8     October of 2013.  So this is about six months before he died.

9     It was one of the last times we actually hung out.

10         "What does heroin smell like, Morgan?"

11         "I don't know, Justin.  What?"

12         "Vinegar and broken dreams."

13         And at the time I thought it was funny, you know, like in

14    a sad but true sort of way, because reality of dying from your

15    addiction, that's so abstract when you're in it.  Me and

16    Justin, we had conversations, "Oh, yeah, ha ha.  This is

17    probably going to kill us."  And it killed him.  And I -- I'm

18    here today and I'm alive.

19         In his death, Justin saved me from suffering the exact

20    same fate.  I am 100 percent certain I would be dead right now

21    if I had not been arrested.

22         After my mom died, I was completely and utterly hopeless.

23    I wanted to kill myself.  I had no desire to live.  And then

24    Justin died, and that saved my life, and that's really hard for

25    me to reconcile.

1    And my experiences at Inverness, it wasn't just that one

2    time, you know.  I had many opportunities to use drugs.  And

3    I'm just so much better than that.  I'm just capable of such

4    greater things.

5    And I wish my mom could see me now because she would be

6    proud.  I actually value my education.  That's my number one

7    priority.  That's why I pay off my school loans.  I make

8    monthly payments on them, even from jail, so that as soon as I

9    get out I can work on getting my bachelor's degree.

10    And I'm finally being the woman my mother raised me to be

11    and living life to the fullest.  Every day that I'm breathing

12    is thanks to Justin DeLong.

13    THE COURT:  Ms. Bolstad, do you have a way of finding

14    out whether Mr. DeLong's mother will make it or not?

15    MS. BOLSTAD:  My apologies, Your Honor.

16    Detective Andersen has been in touch with Ms. Gren, who got

17    mixed up parking, and we believe she's approximately five

18    minutes out.  She's very upset that she missed --

19    THE COURT:  We can adjourn.  Why don't we go into

20    recess for about ten minutes.

21    MS. BOLSTAD:  That would be great.

22    THE COURT:  Why don't we go into recess.  And when

23    she's here, we'll reconvene.

24    MR. BARNETT:  Thank you, Your Honor.

25    MS. BOLSTAD:  Thank you.

1                    (Recess taken.)

2              THE COURT:  Thank you, everyone.  Please be seated.

3    Ms. Bolstad?

4              MS. BOLSTAD:  Thank you, Your Honor.  We're back on

5    the record in the sentencing in the case of United States v.

6    Ms. Godvin.

7        Thank you for taking a break.  The victim's mother is able

8    to speak.  She's here.  Her name is Ms. Gren.

9              THE COURT:  Go ahead and either escort her to where

10   you're sitting or she can come to the witness chair.  Whatever

11   is most comfortable.

12       Good afternoon.

13             MS. GREN:  Hi.

14             THE COURT:  Would you pull the microphone close to

15   you, please?

16             MS. GREN:  Is that better?

17             THE COURT:  Perfect.  Would you state your full name

18   and spell it all just so the record is clear?

19             MS. GREN:  Yes.  It's Ember Leanne Gren.  E-M-B-E-R.

20   L-E-A-N-N-E.  Gren, G-R-E-N.

21             THE COURT:  Thank you, Ms. Gren.  What would you like

22   to tell me?

23             MS. GREN:  A lot of things.

24       So it's an impact statement, and it impacts me because he

25   was my son.  And it's interesting.  I heard an author speak

1  once, and she addressed things and used the term "a single

2  story" and having a single story about people or things, and I

3  feel like I really appreciate everything that the legal system

4  does.  I feel that it's a single story that gets addressed,

5  though.

6      My son is a single story in here as the victim.  And other

7  people's single stories are people who sold him drugs or -- but

8  there's other stories.  There's other stories to Morgan,

9  because I know her, and there's another story to Justin.  He

10  wasn't just a victim.  He was a -- he dealt heroin to support

11  his habit too, and he was also my son and my daughter's

12  brother.

13      At some point I hope with drug addiction it's less of a

14  single story.  I'm sorry.  I'll slow down a little.

15      With addiction and with the way we treat drug addiction

16  and people who are caught up in it and dealing drugs and using

17  them, I hope it becomes somehow less of a single story, and we

18  address them as full human beings.

19      And even the gentleman from Mexico, it's a single story

20  that we have about them coming here and dealing drugs.  They

21  have families back home, and they have limited options.  It's

22  all just really hard to sit in a courtroom and watch their

23  families during their arraignments and hearings and see that

24  they're losing family members just like I did.

25      So a lot of impact has been that I lost my son and the

1  idea of maybe having grandchildren with him and those things,

2  but also it's just broadened the way I think about everyone

3  involved and that it isn't just the one role they're playing in

4  this particular trial.

5          THE COURT:  I saw an email message I believe you sent

6  to the victims coordinator indicating that you were not seeking

7  any restitution --

8          MS. GREN:  Yeah.

9          THE COURT:  -- in this prosecution.  Is that right?

10         MS. GREN:  Yes.

11         THE COURT:  And you also made statements about

12 wanting to ensure that people like Ms. Godvin had the

13 opportunity to get past her own addiction and to get on with

14 her life.  So thank you for sending that message.  It's an

15 important one.

16     These are losses that none of us can imagine until we're

17 in the same situation and many people, certainly in their

18 single story as a victim, can't see beyond that and always

19 harbor a bitterness and a resentfulness that is natural and

20 human, but you've extended to her something that I think no one

21 else could, and I think it's shown, in part, in the way she has

22 fully accepted responsibility and tried to begin to repair her

23 life so that she's not waiting -- she's not wasting time.

24 She's acting on a commitment.

25     I believe fully that that was enabled by your attitude

1    toward her, and I think that is important.

2         Is there anything else you wanted to say?

3              MS. GREN:  No.  Thank you.

4              THE COURT:  Thank you so much for coming.

5         Ms. Godvin, you wanted to say something to Ms. Gren?

6              THE DEFENDANT:  I did.  I really liked your single

7    story concept.  I wrote you this letter here, and I go on for

8    pages.  I just tell stories about Justin and I and the good

9    times.  Some of them are drug related.  Some of them aren't

10   because there was so much more to our friendship than that.

11        The letter you wrote for the judge on my behalf, it was

12   amazing how accurately you described our relationship because

13   Justin and I did, we loved each other so much.  We -- it's hard

14   to find smart heroin addicts.  It's really hard.  And he was

15   really -- he was a brilliant guy.  When we lived in the

16   Rivergreens Apartment complex, there was a golf course there,

17   and he would always try to get me to go golfing.  It was not

18   happening.  Golf was really boring, so that never happened, but

19   we did other things.

20        He was the first person I ever knew that went to jail, and

21   I was pretty distraught over that because people I knew didn't

22   do that.  So I went -- I went to his arraignment, and I put $40

23   on his books.  That was all.  And he never let me forget it,

24   and he felt like he was in my debt for years to come.  It

25   didn't matter if I didn't have money.  Anytime I was dope sick,

1   Justin would help me out for years because of that one time I
2   put $40 on his books.
3        In 2012 I relapsed, and he was -- I was living in Bend,
4   and I moved to my mom's.  I was staying the night at my mom's,
5   and I relapsed, and he was -- I picked him up, and we had gone
6   to my mom's, and I overdosed.
7        And this was not the first time I overdosed in front of
8   Justin.  You were on the phone with Erin the first time.  I was
9   really sorry about that.  That was the first time he told me I
10  am much, much heavier that I look, trying to carry me and put
11  me -- he had warrants, and I wasn't waking up.  He didn't care.
12  And he called 911, and he stayed with me until the police
13  arrived, and he snuck out the back door.  He risked arrest.
14       That's all we did was just -- we loved each other so much.
15  That very next day after I overdosed I let him borrow my car.
16  He curbed it and it got a flat tire.  This left him completely
17  stranded, and I had to find a ride to him to change my tire, to
18  rescue him, because he wasn't capable of changing the tire.
19       And he loved Erin so much.  He was so worried about her.
20            MS. GREN:  She's doing super awesome.
21            THE DEFENDANT:  I'm so thankful for that.
22            MS. GREN:  She lives with me.
23            THE DEFENDANT:  Please tell her I say hello.
24            MS. GREN:  She's in school.
25            THE DEFENDANT:  There's life after heroin, but Justin

1    and I couldn't see it.  I don't know why.  I want you to know

2    that I'm sorry.  The "what ifs" keep me up at night.  What if I

3    just wouldn't have answered my phone?  What if I would have

4    said no?  Maybe he would have gotten it from someone else, but

5    maybe he wouldn't have overdosed.  I will never know that.  I'm

6    so sorry.  I'm so sorry.

7        I was going to die.  After my mom died suddenly, I was

8    going to die, and Justin completely saved my life.  Completely.

9    There's no other way I would be alive right now if it had not

10   been for your son.  I just want to thank you.

11       And please -- I know it's so inadequate, but please come

12   to my college graduation because it wouldn't exist if it wasn't

13   for your son.  Okay.

14            MS. GREN:  I will be there.

15            THE DEFENDANT:  Okay.  Thank you.  And I wrote you

16   this letter.

17            MS. GREN:  Am I allowed to hug Morgan?

18            THE DEFENDANT:  Can she, Judge?

19            THE COURT:  Is there an issue?  Do you need to look

20   at the letter?

21            THE DEFENDANT:  She asked if she could hug me.

22            THE COURT:  Oh, that's up to the marshal.

23            THE DEFENDANT:  I miss him so much.  Thank you so

24   much for coming.  Thank you so much.

25            THE COURT:  Mr. Barnett, is there a requested place

1    for designation?

2          MR. BARNETT:  Your Honor, there is not.  Although,

3    she would ask to be kept as close as possible so she could

4    maintain her contacts.

5       And, again, this is a case of the firsts.  I would ask the

6    Court to give Morgan the opportunity to build on what she has

7    right now.  There's -- in psychology there is the concept of

8    being prepared for something, being mentally and

9    psychologically prepared.  I think that Morgan is well prepared

10   at this moment to benefit from what she has created around her

11   and the support system that she has, and I would ask the Court

12   to perhaps consider something less than 60 months to give her

13   the opportunity to capitalize on the unique circumstance that

14   she is in.

15      And I ask that not so much to reduce the time of her

16   incarceration, as to give her the opportunity to build on the

17   tools that she has created for herself to stay clean and sober.

18   I think that would be of a greater benefit to the community and

19   society as a whole.  I ask you to consider that, please.

20          THE COURT:  Ms. Bolstad, is there anything else you

21   had wanted to add?

22          MS. BOLSTAD:  Your Honor, just to clarify, there is

23   no -- there's no mandatory minimum.  There nothing inhibiting

24   the Court's discretion beyond 60.

25          THE COURT:  All right.  Well, let me back up for

purposes of setting context here.  My responsibility is to impose a sentence that is sufficient but not greater than necessary to accomplish many purposes.

At the heart of the sentencing decision is punishment for criminal conduct, along with a recognition of the person's personal history and characteristics, the good that has been demonstrated here, Ms. Godvin, and your background, as well as the criminal conduct, and then I'm required to take advice from the sentencing guidelines.  You know there's a maximum penalty of 40 years in prison.  The guideline ranges are adjusted for a variety of factors, which I have to take into account.

I'm allowed to exercise discretion both ways.  When the guideline calculations correctly produce a range, I'm allowed to exercise discretion above the range or below the range.  And the overriding principle is that a sentence has to be enough to punish, enough to promote respect for the law, enough to deter others who could be deterred if they knew about what happened to you and to the others who were convicted of this crime; enough to deter you, if you weren't already deterred; enough to promote respect for the law.

The law that prohibits distributing heroin is there for public safety, above and beyond anything else.  And respect for that law, the theory is, helps protect people.  And, yet, we have this raging epidemic of not just addiction, but overdoses and deaths.

1    And against all that, I'm to also balance, as I say, your

2    personal history and characteristics and somehow determine the

3    right thing to do here.  A sentence what's enough but not too

4    much.

5    So with respect to the guidelines, Ms. Bolstad made the

6    point that your crime starts you on the guideline range at the

7    highest level available, which is 38.  There were two levels

8    added to that because of the weapon, so we're at level 40.  You

9    were considered to be one in a minor role in the conspiracy

10   here, and I agree that that is a fair characterization under

11   the guidelines.  So that allows for a three-level reduction.

12   So from 40, we move to 37, and then another three levels for

13   acceptance of responsibility.  Two levels is pretty much

14   automatic.  When someone pleads guilty, three levels is given.

15   Not in every case.  The two plus one to three is not given in

16   every case, but in your case the prosecutor unequivocally

17   recommends it, and I agree because you have fully accepted

18   responsibility.

19   So we go, then, from 37 to 34.

20   The prosecutor then recommends two more levels off because

21   you accepted responsibility early.  And, as to you, there

22   wasn't any question, from her perspective, that you were not

23   going to cost the prosecution the burden of proving you guilty

24   beyond a reasonable doubt by trial by jury or cost the system

25   the need to pull all the witnesses together to try you.  That

1    is considered a fair reason to reduce a guideline.

2         So we go from 34 to 32.

3         And then under Chapter 5 the government made this motion

4    for a four-level reduction, which she has -- Ms. Bolstad has

5    fully supported.  I agree with her characterization that your

6    participation at trial was at every level to be credited as

7    truthful, consistent.  Brave and straightforward were her

8    words.  I agree with those characterizations.

9         And that, then, took us to level 28.  We're at Criminal

10   History Category II, because you do have your own story.  It's

11   not a single story.  It has its own dimensions.  And criminal

12   histories count, so you ended up at a guideline range of 87 to

13   108 months.

14        Now, before all those adjustments, were variances for your

15   early acceptance, for Chapter 5, the range, as I calculated it,

16   it was 168 months to 210 months before those adjustments.

17        And now the government is recommending a five-year

18   sentence, and Mr. Barnett has said he's imploring me to follow

19   that recommendation and yet made the point, too, that he can't

20   really argue for less but I should consider less.

21        The truth is you've done everything you can do.  You've

22   done everything you can do, given what you did do and given

23   what its profound cause was, and there really isn't anything

24   more anyone else can say about that other than you have to go

25   to prison.  You have to serve a sentence.  And if what you've

1  demonstrated to now is any sign of what you're able to do while

2  you're in prison, you're going to be a credit to the community

3  when you come out.

4      I believe you're going to help other people who are

5  plagued by the very addiction that got you so twisted and away

6  from your talents and potential.  But the good news in that

7  story is that you have a life to reclaim and you have the

8  talent and intellect and it looks like really unstoppable

9  motivation, as long as you stay clean, to go forward.

10      Given the -- this very serious crime, however, I do not

11  believe it's reasonable to sentence you below 60 months.  I

12  just -- for you personally, I wish I could write a -- another

13  end to your single story that would allow you to walk out of

14  jail and just pretend it didn't happen and move on, but that

15  can't happen.

16      I want you to be proud of what you've accomplished since

17  that day the police came to your apartment.

18      You know, Ms. Bolstad is focusing on your -- your early

19  cooperation and Mr. Barnett emphasized that even at your

20  arraignment you were ready to talk, but I remember the

21  testimony of the officers being in your living room and making

22  a proposal to you.  Of course it had a benefit.  Cooperate and

23  you can avoid a very serious mandatory penalty, or not, and, I

24  don't know, we saw how some people reacted when that premise

25  was presented to them in your case, and we saw how others

1   reacted, but it seems to me you never hesitated, from the

2   beginning, even though you were facing extraordinary risks to

3   your own liberty and your own future.  That's, I think,

4   evidence of your fundamental characteristic.

5        So when I'm told I need to evaluate those personal

6   characteristics, you, Ms. Godvin, are, at your core, a good

7   person who got very twisted up in this hideous habit that

8   indeed could have ruined your life, did cause the death of your

9   friend, has caused the deaths of many others, is still ruining

10  the lives of so many others, but there's real hope for you.

11       So if you were carrying a secret hope that maybe it would

12  be better than 60 months, I'm just -- I don't think that is

13  reasonable.  So I'm setting that unrealistic hope over there.

14       But look at it this way:  60 months is a lot less than 168

15  months and definitely less than ten years.

16       I don't think you even need that college degree.  You know

17  you have a future and you know you can make great strides while

18  you're in prison, so I don't feel the need to try to encourage

19  your knowledge to do that.  I know you're already launched in

20  that way.

21       I hope you will help Mr. Barnett as he works with

22  Ms. Bolstad to write that letter I was referring to because

23  you're the source of specific information.  And what the

24  sheriff does with it is his concern, but I think there ought to

25  be a formal presentation to him in a letter that lays out these

concerns.  Not just the shocking information you testify to
about open drug use within the correctional facilities and in
inpatient treatment program, but what is so unfortunate is that
while you were working on a program and trying to advance
yourself, what you needed for that, your books, your notes and
all of that, were lost or taken from you or whatever happened
there.  That needs to be noted so that something can be done in
the future for the next Morgan Godvin who comes along with that
level of motivation, so that that particular frustration is not
there.

In addition to the prison sentence, you have to pay a $100
statutory assessment.  That's required by law.  The sooner you
get it paid, the sooner the Bureau of Prisons will stop taking,
fractionally, money off your books every month; the money that
would otherwise be available for toothpaste or whatever.

There's not any restitution obligation being sought here,
so none is imposed.  It's not reasonable in this context for me
to impose a fine because, first of all, you don't have the
means to pay it, but, secondly, I don't think it's warranted,
so I'm not imposing any fine.

I'm imposing a period of supervised release of three years
following your release from prison.

Now, it's a condition of supervised release that you obey
all laws, that you report truthfully and regularly to your
probation officer.  You were on release pretrial for a period

1    of time.  It's a similar kind of set of standard conditions

2    that you'll have to follow.

3         In addition to those, you'll have to provide a DNA sample

4    if your probation officer requests it.

5         On your release, I want you to have an updated mental

6    health and substance abuse evaluation because what I want to

7    know when you come out is what you need.

8         If you're no longer at risk for relapse and those kinds of

9    behaviors, then this recommendation of an inpatient treatment

10   program might not be timely.  On the other hand, if a

11   professional says that would be of use, then you're going to be

12   required to comply with your probation officer's directions for

13   a treatment program for your mental health, for substance

14   abuse, and if you're -- if the professionals say an inpatient

15   program for up to 120 days be warranted and that is what your

16   PO says to do, that's what you need to do.

17        The point of having the evaluation, though, is to see

18   where you really are, because we don't know.  You'll have that

19   prison experience behind you.

20        While you're in prison, you'll have access to a number of

21   counseling opportunities.  Take advantage of the resources

22   there.  Find out from the counselors what programs are within

23   the circle of your potential interests and skills for which you

24   qualify.  Plus, you can make good use of those days or not.

25   You can be a good example to others who are not.  You can get

1    caught up in the -- the negative part of that culture or not,

2    and you can come out much stronger than you even are today.    I

3    really hope that's the case.

4        We have presently in the Court a reentry court program.

5    What it is involves sustained support on a multidisciplinary

6    level with a judge, a prosecutor, a defender, treatment

7    professionals, and the like, working with a group of

8    individuals who are on supervision, who help them stay clean

9    and to address whatever needs they have.    The people that are

10    in that program, when they succeed, graduate.    They get to

11    knock a year off the supervision end.

12        You may or may not be interested in that.    You may or may

13    not be a candidate for that.    I don't get to say whether

14    someone goes in or not.    That's a matter for the team to

15    accept.    But you are going to be required to observe a session

16    of the reentry court assuming -- and I certainly hope that's

17    the case -- that it's still in effect.

18        I recommend that the Bureau of Prisons designate you first

19    to the lowest security setting for which you qualify because I

20    think your good behavior while you've been in custody --

21    although, you had a violation that brought you back to

22    custody -- has been remarkable and you should be given all the

23    privileges for which you qualify.

24        I recommend they designate you to a facility as close to

25    the District of Oregon as reasonable.

1          That said, however, there's not a women's facility here,

2     and I can't change that.

3          If it's not clear, then I've accepted the guidelines

4     analysis set out by the PSR writer and by counsel.  I've also

5     granted the government's motion as reflected in the conclusion

6     that I drew the four-level reduction should be allowed.

7          Now, from 87, at a low end of 28, Category II, to get to

8     60, I need to vary further to a level 24.  So that's to get to

9     the low-end range of 60, which is within the 57- to 71-month

10    range at Criminal History Category II.  Check my math.

11         Ms. Bolstad has been known to correct my addition and

12    subtraction, so I want to be sure.

13              MS. BOLSTAD:  I think you're right, Your Honor.

14              THE COURT:  Okay.  Is there anything else,

15    Ms. Bolstad?

16              MS. BOLSTAD:  Yes, Your Honor.  I made a mistake in

17    my sentencing memorandum in recommending three years of

18    supervised release.

19              THE COURT:  Oh, okay.

20              MS. BOLSTAD:  The plea is correct and the PSR is

21    correct that it's actually a minimum four-year term of

22    supervised release.

23              THE COURT:  So it will be four.

24              MS. BOLSTAD:  And then the government also moves to

25    dismiss Counts 1, 4, and 5 as to this defendant.

1    THE COURT:  And they're dismissed.

2    Now, Ms. Godvin, as part of your plea agreement with the

3    prosecutors, you gave up your right to appeal to a higher court

4    the fact that I allowed you to plead guilty and any appeal of

5    the sentence I just imposed as long as I did not sentence you

6    higher than the correctly calculated guideline range before any

7    adjustments, which I clearly did not.

8    So if you think you have a right to appeal, you only have

9    14 days to file a notice of appeal.

10    If you did, you can bet Ms. Bolstad will be right there

11    telling me, "We have a deal.  She gave it up."  I'm still

12    required to tell you that.  Do you understand?

13    THE DEFENDANT:  Yes, Your Honor.

14    THE COURT:  Mr. Barnett, do you have anything else?

15    MR. BARNETT:  Other than thanks to Ms. Bolstad for

16    catching that.  I was not paying attention to when the Court

17    said three years of the supervised release.  Thank you.

18    THE COURT:  Thank you for raising that.  All right.

19    Good luck.

20    THE DEFENDANT:  Thank you, Your Honor.

21    THE COURT:  Take care of yourself.

22    We're in recess on this matter.

23    (Hearing concluded.)

24

25

1                    C E R T I F I C A T E

2

3       UNITED STATES OF AMERICA v. MORGAN ELIZABETH GODVIN

4                       3:14-cr-00267-BR

5                          SENTENCING

6                      December 21, 2015

7

8            I certify, by signing below, that the foregoing is a

9    true and correct transcript of the record, taken by

10   stenographic means, of the proceedings in the above-entitled

11   cause.  A transcript without an original signature, conformed

12   signature, or digitally signed signature is not certified.

13

14   /s/Jill L. Jessup, CSR, RMR, RDR, CRR
     _____
15
     Official Court Reporter     Signature Date: 6/16/16
16   Oregon CSR No. 98-0346       CSR Expiration Date:  3/31/17

17

18

19

20

21

22

23

24

25